**COLUMBIA BROADCASTING SYSTEMS, INC., Petitioner,**

v.

**UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF CALIFORNIA, Respondent,**

**and**

**United States of America and John Z. DeLorean, Real Parties in Interest.**

No. 83–7790.

United States Court of Appeals, Ninth Circuit.

Argued, Submitted and Decided Oct. 23, 1983.

Filed April 6, 1984.

Jack B. Purcell, O'Melveny & Myers, Los Angeles, Cal., for CBS Inc.

Stephen E. Trott, Asst. U.S. Atty., Los Angeles, Cal., for U.S.D.C. for Central California.

Howard L. Weitzman, Weitzman & Re, Los Angeles, Cal., for DeLorean.

Before GOODWIN, NORRIS, and REINHARDT, Circuit Judges.

NORRIS, Circuit Judge:

The Columbia Broadcasting System, Inc. (CBS) contends that a district court order temporarily restraining CBS from "disseminating and/or broadcasting any portion of any and all government surveillance tapes generated in the investigation and prosecution of the matter entitled *United States of America v. John Z. DeLorean*" violates the network's rights under the first amendment. We agree and therefore vacate the restraining order.

I

On Saturday, October 22, 1983, defendant John DeLorean filed an ex parte application for a temporary restraining order with the District Court for the Central District of California. In the application, defendant alleged that CBS had obtained and intended to broadcast video tapes made by the government during an investigation of him. The government joined defendant in urging the court to restrain CBS from broadcasting the tapes.

On the basis of defendant's application and accompanying documents, the district court found that public dissemination of the government tapes "would irreparably harm defendant's Sixth Amendment fair trial right" and, on October 22, the day the application was filed, issued a temporary restraining order prohibiting CBS from broadcasting the tapes. In addition, the district court scheduled a hearing on the issuance of a preliminary injunction for Monday, October 24, 1983 at 3:30 P.M.

On Saturday afternoon, prior to issuing the temporary restraining order, the district court contacted counsel for CBS by telephone. Counsel was informed of the

nature of the proposed order and of the court's intention to file it. After permitting counsel to present counter arguments during the phone conversation, the district court issued the order.

CBS immediately sought relief in this court.

## II

■ At the outset, we must address a jurisdictional question. Although CBS has styled its request for relief as an appeal, under Ninth Circuit precedent CBS has no right to appeal in this case. In *United States v. Sherman*, 581 F.2d 1358 (9th Cir. 1978), the court considered whether representatives of the media could appeal a court order requiring that all members of the public, including the media, refrain from contacting jurors. The court held that an appellant "not a party to the action below ... lacks standing to bring an appeal." *Id.* at 1360. *See also United States v. Brooklier*, 685 F.2d 1162 (9th Cir.1982). While we may question the wisdom of this rule, *see, e.g., United States v. Chagra*, 701 F.2d 354 (5th Cir.1983); *Newman v. Graddick*, 696 F.2d 796 (11th Cir.1983); *Belo Broadcasting Co. v. Clark*, 654 F.2d 423 (5th Cir.1981); *United States v. Hubbard*, 650 F.2d 293 (D.C.Cir.1980); *United States v. Gurney*, 558 F.2d 1202 (5th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); *United States v. Schiavo*, 504 F.2d 1 (3d Cir.1974) (en banc), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1975), we are bound nonetheless to follow *Sherman* as controlling Ninth Circuit precedent. Accordingly, we hold that CBS lacks standing to appeal the temporary restraining order issued by the district court.

The fact that CBS has styled its pleadings as an appeal does not, however, foreclose us from reviewing the temporary restraining order under our mandamus jurisdiction. 28 U.S.C. § 1651. If the appropriate criteria are met, we are free to treat CBS's request for relief as a petition for a writ of mandamus. *Unified Sewerage Agency v. Jelco, Inc.*, 646 F.2d 1339, 1343 (9th Cir.1981).

■ In *Bauman v. United States District Court*, 557 F.2d 650 (9th Cir.1977), we set forth the criteria which determine the availability of mandamus.[1] Three of the *Bauman* factors weigh heavily in favor of an exercise of our mandamus jurisdiction. The first *Bauman* factor—lack of other adequate means of obtaining the desired relief—is satisfied because, as already indicated, direct appeal is unavailable. The second *Bauman* factor—damage not correctable on appeal—is also satisfied. The first amendment informs us that the damage resulting from a prior restraint—even a prior restraint of the shortest duration—is extraordinarily grave. Thus, in *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976), the Court stated that "prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights" and indicated that "the burden on the [party seeking the restraint] is not reduced by the temporary nature of a restraint." *See also Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Finally, as will be explained below, we be-

---

1. In *Bauman v. United States District Court*, 557 F.2d 650 (9th Cir.1977), we stated:

    [W]e have identified five specific guidelines: (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires.... (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal.... (3) The district court's order is clearly erroneous as a matter of law.... (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules.... (5) The district court's order raises new and important problems or issues of law of first impression....

    [R]arely if ever will a case arise where all the guidelines point in the same direction or even where each guideline is relevant or applicable. The considerations are cumulative and proper disposition will often require a balancing of conflicting indicators.

    *Id.* at 654–55 (citations omitted).

lieve that the district court's decision to restrain CBS was clear error as a matter of law and consequently the case satisfies the third *Bauman* factor. Thus, the *Bauman* analysis favors an exercise of our mandamus jurisdiction.[2]

We conclude that this is an appropriate case for the exercise of our mandamus jurisdiction, and we construe CBS's pleadings accordingly.

### III

This case requires that we resolve the tension between two constitutional rights of first importance: the right of the criminal defendant to "an impartial jury," U.S. Const. amend. VI, and the right of the press to be free from governmental restraint, U.S. Const. amend. I.

▆ The Supreme Court addressed the problem of how to reconcile these two seemingly incompatible constitutional rights in *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and set forth guidelines which control our decision today. Before an appellate court may uphold a lower court restraint on the reporting of a trial, the appellate court

> must examine the evidence before the trial judge when the order was entered to determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial pub-

licity; and (c) how effectively a restraining order would operate to prevent the threatened danger.

*Id.* at 562, 96 S.Ct. at 2804. Only if it is "clear [from this independent inquiry] that further publicity, unchecked, would so distort the views of potential jurors that 12 c[an] not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court" can an appellate court even consider upholding a prior restraint. *Id.* at 569, 96 S.Ct. at 2807.[3]

This standard is an extraordinarily exacting one. In *Nebraska Press,* the Supreme Court itself reserved judgment on whether the showing it required could ever be made adequately. *Id.* at 569–570, 96 S.Ct. at 2807–2808. And since *Nebraska Press* was decided, federal and state appellate courts have held without exception that trial court restraints on the reporting of judicial proceedings failed to meet the requirements set forth in *Nebraska Press. See, e.g., In re CBS,* 697 F.2d 1225 (5th Cir.1983); *Arkansas Gazette Co. v. Lofton,* 269 Ark. 109, 598 S.W.2d 745 (1980); *Des Moines Register & Tribune Co. v. Osmundson,* 248 N.W.2d 493 (Iowa 1976).[4]

In the case before us, however, the district court made the inquiry required by *Nebraska Press* and concluded that a prior restraint was permissible. The district court found (1) that this case has generated "enormous, incessant and continually in-

---

**2.** We have previously held that similar restraints may be challenged via a petition for a writ of mandamus. *Associated Press v. United States District Court,* 705 F.2d 1143 (9th Cir. 1983) (order sealing temporarily all documents filed in a criminal proceeding); *United States v. Brooklier,* 685 F.2d 1162 (9th Cir.1982) (order excluding the press from a criminal trial); *Goldblum v. NBC,* 584 F.2d 904 (9th Cir.1978) (order requiring production of motion picture preliminary to determination whether injunction is appropriate); *United States v. Sherman,* 581 F.2d 1358 (9th Cir.1978) (order prohibiting the press from talking with jurors).

**3.** It should be noted that four members of the Court indicated that even this showing might be inadequate to validate a prior restraint. *See Nebraska Press Association v. Stuart,* 427 U.S.

539, 570, 96 S.Ct. 2791, 2808, 49 L.Ed.2d 683 (1976) (White, J., concurring); *id.* at 572, 96 S.Ct. at 2809 (Brennan, J., concurring, with whom Stewart, J. and Marshall, J. join).

**4.** The rigor of the *Nebraska Press* examination has lead many commentators to conclude that as a practical matter the decision barred all prior restraints on the reporting of judicial proceedings. *See, e.g.,* Portman, The Defense of Fair Trial from *Sheppard* to *Nebraska Press Association:* Benign Neglect to Affirmative Action and Beyond, 29 Stan.L.Rev. 393, 409 n. 72 (1977); Prettyman, *Nebraska Press Association v. Stuart:* Have We Seen the Last of Prior Restraints on the Reporting of Judicial Proceedings, 20 St. Louis U.L.J. 654 (1976); Younger, Some Thoughts on the Defense of Publicity Cases, 29 Stan.L.Rev. 591 (1977).

creasing publicity" and, consequently, release of the government tapes would have a "devastating effect"; (2) that "there is absolutely no method ... to remove the taint upon the minds of potential jurors"; and (3) implicitly, that an order restraining CBS from broadcasting the tapes would adequately guard against the threatened danger.[5] On the basis of these findings, the district court held that the public dissemination of the government tapes would "irreparably harm defendant's Sixth Amendment fair trial right" and that an order restricting CBS's freedom of expression was appropriate.

Subjecting the district court's determinations to the de novo review required by *Nebraska Press*, 427 U.S. at 562, 96 S.Ct. at 2804; *see also United States v. McConney*, 728 F.2d 1195 (9th Cir.1984) (en banc) (a question is reviewed de novo when "the inquiry involved ... goes well beyond the facts of the case and requires consideration of the abstract legal principles that inform constitutional jurisprudence"), we conclude that the first two of the district court's determinations are unfounded. The district court's conclusion that this case meets the requirements enunciated in *Nebraska Press* is thus clear error under the *Bauman* test.[6]

### IV

### A

The district court's determination that release of the government tapes would be prejudicial was based upon two grounds: first, that the case had generated "enormous" publicity and that this increased the danger that dissemination of the tapes would prejudice jurors because "the poten-

tial for irreparable harm to defendant's right to a fair trial is directly proportional to the amount of public attention accorded this case;" second, that the nature of the audiovisual tapes in question ensured that potential jurors who viewed them would be prejudiced because the audiovisual tapes "would undoubtedly authenticate in the public's mind the alleged events which occurred during the investigation of this matter."

We have no quarrel with the district court's evaluation of the magnitude of publicity accorded this prosecution. The case has indeed generated "enormous, incessant and continually increasing publicity." Widespread publicity, however, does not necessarily lead to an unfair trial. In *Nebraska Press*, the Supreme Court noted that "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." 427 U.S. at 565, 96 S.Ct. at 2805. *See also Gannett Co. v. DePasquale*, 443 U.S. 368, 403, 404 n. 1, 99 S.Ct. 2898, 2917, 2918 n. 1, 61 L.Ed.2d 608 (1979) (Rehnquist, J., dissenting) and cases cited therein.

Recent highly publicized cases indicate that even when exposed to heavy and widespread publicity many, if not most, potential jurors are untainted by press coverage. In one of the recent Abscam prosecutions, the court found that, despite concentrated media coverage, "only about one-half of the prospective jurors indicated that they had ever heard of Abscam ... [and of those] only eight or ten had 'anything more than a most generalized kind of recollection what it was all about.'" *United States v. Myers*, 635 F.2d 945, 948 (2nd Cir.1980)

---

5. The district judge did not apply the *Nebraska Press* test by name. Instead, he referred in his Order to two attached Memoranda in which he discussed whether, under the test set forth in *United States v. Brooklier*, 685 F.2d 1162 (9th Cir.1982), the court should allow pretrial public access to exhibits, including the government tapes. These Memoranda concluded that such access should not be permitted. The *Brooklier* test is identical to the *Nebraska Press* test. Consequently, we interpret the district judge's reference to his attached Memoranda as a statement

that the *Nebraska Press* inquiry had been conducted and that, in his opinion, the *Nebraska Press* requirements had been met.

6. Because we reject the district court's resolution of the first two steps in the *Nebraska Press* inquiry, we find it unnecessary to consider its resolution of the third step—determination of how effectively a restraining order would operate to prevent the threatened danger.

(quoting the trial transcript). Similarly, in one of the Watergate prosecutions, the District of Columbia Circuit stated that, despite perhaps the most pervasive publicity accorded any trial in American history, "without undue effort, it would be possible to empanel a jury whose members had never even heard the [Watergate] tapes." *United States v. Mitchell*, 551 F.2d 1252, 1262 n. 46 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The court justified this conclusion by noting that in a previous Watergate prosecution ten of the twelve jurors selected "claimed to have followed Watergate casually, if at all." *Id.* (citing *United States v. Haldeman*, 559 F.2d 31 (D.C.Cir.1976)). *See also United States v. Liddy*, 509 F.2d 428, 436–37 (D.C. Cir.1974) (en banc), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).[7]

Thus, both precedent and experience indicate that widespread publicity, without more, does not automatically lead to an unfair trial. Here, the district court apparently believed that the peculiarly prejudicial nature of the government tapes—in particular the fact that they purport to be "the 'actual' depiction or 'mirroring' of the events and transaction in question"—distinguished this case from other highly publicized trials and that the case thus satisfied the first leg of the *Nebraska Press* analysis. We cannot agree.

■ Even if we assume *arguendo* that a prospective juror who has viewed all or some of the investigation tapes is likely to harbor preconceptions that would threaten Mr. DeLorean's right to trial by an impartial jury, the test enunciated in *Nebraska Press* requires much more to justify prior restraint. In the Court's words, a prior restraint can not issue unless it is "clear that further publicity, unchecked, would so distort the views of potential jurors that *12 could not be found* who would ... fulfill

their sworn duty." 427 U.S. at 569, 96 S.Ct. at 2807 (emphasis added). Thus, it is not enough that publicity might prejudice one directly exposed to it. If it is to be restrained, the publicity must threaten to prejudice the entire community so that twelve unbiased jurors can not be found.

■ This requirement is in keeping with the standard which the Supreme Court has applied in reviewing pre-trial publicity in order to determine whether the defendant was deprived of his right to a fair trial. In the absence of evidence of actual juror prejudice, the Court has refused to reverse jury verdicts unless it concluded that the atmosphere of the entire community had been poisoned by the publicity in question. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), for instance, the Court overturned a guilty verdict because a "'pattern of deep and bitter prejudice' [was] shown to be present throughout the community." *Id.* at 727, 81 S.Ct. at 1645 (*quoting Stroble v. California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952)). *See also Murphy v. Florida*, 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 545, 85 S.Ct. 1628, 1634, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963).

Thus, in assessing the prejudicial nature of pre-trial publicity, a court must look not simply to its effect on individual viewers but to its capacity to inflame and prejudice the entire community. In this case, the district court failed to make such an analysis. For this reason alone, its conclusion that release of the government tapes would be highly prejudicial is suspect. We further conclude, however, that given the nature of the case and the setting for the trial, the district court could not have properly found that release of the tapes would

---

**7.** After noting that "[m]ost of the venire simply did not pay an inordinate amount of attention to Watergate," another Watergate court explained, "[t]his may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally." *United States v. Haldeman*, 559 F.2d 31, 62–63 n. 37 (D.C.Cir.1976) (en banc).

create a " 'pattern of deep and bitter prejudice' ... throughout the community." *Irvin v. Dowd*, 366 U.S. 717, 727, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961).

First, most of the cases in which pre-trial publicity has presented serious constitutional problems have involved lurid subject matter. In *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the defendant was charged with armed robbery, kidnapping, and murder. In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the defendant was a prominent citizen accused of bludgeoning his pregnant wife. Where the case has involved less inflammatory subject matter, the courts have generally found a less significant danger of prejudice. Thus, in *United States v. Haldeman*, 559 F.2d 31, 62 n. 37 (D.C.Cir.1976) (en banc), the court stated:

> The Government maintains that since "[t]he offenses charged here were not crimes of violence and passion," but rather legally complex white collar crimes, pretrial publicity would make little impression on most citizens....
>
> Our own reading of the 2,000-page *voir dire* demonstrates that the Government's assessment of the public's interest in Watergate matters is correct.... This may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally.

*See also United States v. Kahaner*, 204 F.Supp. 921, 924 n. 11 (S.D.N.Y.1962) ("The publicity here was not of the inflammatory and lurid nature considered or condemned in a number of Supreme Court cases."), *aff'd*, 317 F.2d 459 (2d Cir.1963), *cert. denied*, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

Here, the subject matter of the case is neither lurid nor highly inflammatory. Mr. DeLorean is charged with conspiracy to import cocaine, a non-violent crime that is similar in nature to hundreds of others currently before state and federal trial judges in California. It seems that hardly a week passes in which there is not media coverage of a major narcotics arrest or trial. While Mr. DeLorean's prominence has certainly distinguished his case from the others in that he has attracted far more public attention, there is no evidence that his prominence will inflame public sentiment.

Second, the courts have long held that in a large metropolitan area, prejudicial publicity is less likely to endanger the defendant's right to a fair trial. The size and heterogeneity of such communities make it unlikely that even the most sensational case will become "a *cause celebre*" where "[t]he whole community ... becomes interested in all the morbid details." *Estes v. Texas*, 381 U.S. 532, 545, 85 S.Ct. 1628, 1634, 14 L.Ed.2d 543 (1965). *See United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *People v. Manson*, 61 Cal.App.3d 102, 189–90, 132 Cal. Rptr. 265 (1976), *cert. denied*, 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977). Moreover, in a populous metropolitan area, the pool of potential jurors is so large that even in cases attracting extensive and inflammatory publicity, it is usually possible to find an adequate number of untainted jurors. The case of former Attorney General John Mitchell, for instance, was very heavily publicized in Washington, D.C., where the trial was held, and a private survey conducted by Mr. Mitchell's attorneys revealed that 84% of those who had heard of the case thought Mr. Mitchell guilty. Yet, Mr. Mitchell was eventually acquitted. *See* Graham, From the Press, *in The Jury System in America* 199, 202 (R. Simon, ed. 1975).

Almost all the cases in which the Supreme Court has found that press coverage deprived the defendant of a fair trial have been tried in small rural communities. In *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the trial was held in a Louisiana parish of 150,000. *Id.* at 724, 83 S.Ct. at 1814. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the trial was held in a county of approximately 30,000 inhabit-

ants.[8] In contrast, when the trial has been set in a large urban area, publicity has presented less significant problems. *See Associated Press v. United States District Court,* 705 F.2d 1143, 1146 (9th Cir.1983) (Los Angeles); *People v. Manson,* 61 Cal. App.3d 102, 189, 132 Cal.Rptr. 265 (1976) (Los Angeles), *cert. denied,* 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977); *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971) (Philadelphia). In *People v. Manson,* 61 Cal.App.3d 102, 132 Cal.Rptr. 265 (1976), *cert. denied,* 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977), for instance, the California Court of Appeal rejected a prejudicial publicity claim based, in part, on its belief that "[a] metropolitan setting with its diverse population tends to blunt the penetrating effect of publicity." *Id.* at 190, 132 Cal.Rptr. 264. *Cf. United States v. Chapin,* 515 F.2d 1274, 1288 (D.C.Cir.) (affirming trial court's refusal to grant change in venue from Washington, D.C. to a "more rural community"), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

Mr. DeLorean's trial is to be conducted in the District Court for the Central District of California. The Central District is the most populous district in the federal judicial system. According to the 1980 census, the district includes nearly twelve million people.[9] In addition, the Central District encompasses one of the most heterogeneous metropolitan areas in the United States—Los Angeles.

Given these circumstances, we think it is extremely unlikely that the release of the government tapes will produce the community-wide prejudice required by *Nebraska Press.*

### B

■ The district court's handling of the second leg of the *Nebraska Press* analysis—the consideration of measures for assuring a fair trial other than a prior restraint on expression—is equally unconvincing. The district court stated that while "much thought and analysis had been devoted to the consideration of alternatives," the court had "failed in formulating reasonable and effective alternatives." This conclusion, however, is based on conclusory treatment of one alternative and disregard of another.

The district court rejected the use of extensive voir dire as an alternative to prior restraint because "[n]o matter how searching the questions ... certain matters are not detectable, especially those motives relative to bias and prejudice." The court made no reference to special circumstances posed by defendant DeLorean's case which might support this contention. Thus, the court's reasoning amounts to a general rejection of voir dire as an effective alternative to prior restraint.

This rejection, however, is inconsistent with applicable precedent. In *Nebraska Press,* 427 U.S. at 563–64, 96 S.Ct. at 2804–05, the Supreme Court made explicit reference to voir dire as an important alternative to be considered by the trial court. Similarly, the circuit courts have repeatedly found voir dire to be a viable alternative to restraints on the press, even in cases attracting massive publicity. *See Los Angeles Memorial Coliseum Commission v. National Football League,* 726 F.2d 1381, at 1400 (9th Cir.1984) (suit concerning move of the Raiders football team from Oakland to Los Angeles); *United States v. Myers,*

---

**8.** *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), is of course an exception to this general rule. There, the trial was held in the Court of Common Pleas of Cuyahoga County, Ohio. *Id.* at 335 n. 1, 86 S.Ct. at 1508 n. 1. Cuyahoga County encompasses Cleveland, a major metropolitan area. We believe, however, that *Sheppard* is distinguished by the truly extraordinary quantity and nature of the publicity which surrounded the trial, *see id.* at 338–349, 86 S.Ct. at 1509–1515, by the sensational nature of the crime, *id.* at 356, 86

S.Ct. at 1519, and by the trial judge's failure to adequately control the proceedings, *id.* at 357–58, 86 S.Ct. at 1519–20.

**9.** We note that in *Nebraska Press* the Supreme Court appeared to indicate that a pool of prospective jurors as small as 80,000 might be adequate protection against prejudicial publicity. 427 U.S. 539, 563 n. 7, 96 S.Ct. 2791, 2805 n. 7, 49 L.Ed.2d 683 (1976).

635 F.2d 945, 953–54 (2d Cir.1980) (Abscam); *United States v. Mitchell,* 551 F.2d 1252, 1262 n. 46 (D.C.Cir.1976) (Watergate), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). In fact, in an earlier proceeding in this very case, we held that voir dire was an appropriate alternative to the sealing of court documents. *Associated Press v. United States District Court,* 705 F.2d 1143, 1146 (9th Cir.1983) ("[B]ased on the record before us, we believe that careful jury selection is an alternative that can adequately protect the right to a fair trial.").

While the district court rejected voir dire without adequate analysis, it failed to consider altogether the prophylactic effect of "emphatic and clear instructions" to the jury. *Nebraska Press,* 427 U.S. at 564, 96 S.Ct. at 2805. Yet, like voir dire, this is an alternative explicitly mentioned in *Nebraska Press,* 427 U.S. at 564, 96 S.Ct. at 2805, and relied upon by other courts in cases involving highly publicized trials, *Los Angeles Memorial Coliseum Commission v. National Football League,* 726 F.2d 1381, 1400 (9th Cir.1984); *Associated Press v. United States District Court,* 705 F.2d 1143, 1146 (9th Cir.1983).

The Supreme Court has emphasized that these traditional devices used for combating prejudice are powerful tools that should be adequate to defuse prejudicial pre-trial publicity. In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), a case involving publicity far more inflammatory than present here, the Supreme Court concluded that prejudice could have been adequately controlled by the trial judge through traditional methods. *Id.* at 357–58, 86 S.Ct. at 1519–20. In his concurrence in *Nebraska Press,* Justice Brennan stated that "the traditional techniques approved in *Sheppard* for ensuring fair trials would have been adequate in every case in which [the Supreme Court] ha[s] found that a new trial was required due to lack of fundamental fairness to the accused." 427 U.S. at 603–04, 96 S.Ct. at 2824. In light of these pronouncements, there may be no reason for courts ever to conclude that traditional methods are inadequate and that the extraordinary remedy of prohibiting expression is required.

In light of the district court's inadequate consideration of voir dire and jury instructions as alternatives to a restraining order, we conclude that a showing has not been made that "there is absolutely no method ... to remove the taint upon the minds of potential jurors" which could possibly result from release of the government tapes.

V

■ In sum, we find the district court's resolution of the first two legs of the *Nebraska Press* analysis to be unpersuasive. We reject both the district court's contention that dissemination of the tapes was likely to prejudice the defendant's right to a fair trial and its contention that traditional means of dealing with such prejudice— voir dire and jury instructions, for instance—were inadequate. Thus, we hold that the entry of an order restraining CBS from broadcasting the tapes on the showing made before the district court violated the first amendment guarantee of freedom of the press. The showing on the record fails to establish that "further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." 427 U.S. at 569, 96 S.Ct. at 2807. Consequently, we vacate the temporary restraining order.

■ We conclude by noting that under our constitutional system prior restraints, if permissible at all, are permissible only in the most extraordinary of circumstances. In *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the government sought to restrain the publication of " 'material whose disclosure would pose a grave and immediate danger to the security of the United States'." *Id.* at 741, 91 S.Ct. at 2155 (Marshall, J., concurring) (quoting Brief for the

United States at 7). Yet, the Supreme Court found that the government had failed to carry the " 'heavy burden of showing justification for such a restraint'." *Id.* at 714, 91 S.Ct. at 2141 (quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971)). Writing separately, Justice Brennan stated that "only government allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order." *Id.* at 726–27, 91 S.Ct. at 2148 (Brennan, J., concurring). Whether a prior restraint on the reporting of a judicial proceeding will ever be able to satisfy this extraordinary standard remains to be seen. It is clear, however, that this case does not.

The petition is GRANTED.

GOODWIN, Circuit Judge, concurring:

I agree with the able presentation of the court's opinion by Judge Norris, and write separately only to underscore some additional points.

■ First, the trial court had no legal authority for enjoining CBS or anyone else from publishing anything in this case. Congress, in obedience to the First Amendment, has "made no law abridging the freedom of ... the press" in situations of this kind. See, Douglas, J., specially concurring, in *New York Times Company v. United States*, 403 U.S. 713, 720, 91 S.Ct. 2140, 2144, 29 L.Ed.2d 822 (1971).

■ Second, Judge Norris has pointed out that there is no American judicial authority for a trial court to enjoin the publication of information in a situation of this kind. A judge's assignment to preside over a criminal trial carries with it no general commission to issue orders to persons not before the court whose conduct has not yet caused a disruption or impediment to the work of the court.

Third, the opinion properly does not discuss the interesting question of how CBS came into possession of the tapes because the matter was not documented in any written record produced for our examination. However, at oral argument it became clear that defense counsel, or some of them, had obtained from the prosecution copies of the tapes for defense purposes, and that somehow, while under control of the defense, a copy of the tapes fell into the hands of persons who made them available to CBS. There was no suggestion that CBS had done anything illegal or unethical in obtaining the copy.

■ Finally, as Mr. Justice Linde of the Oregon Supreme Court has pointed out, there is no conflict between the Sixth Amendment right to a fair trial and the First Amendment right to publish information. Both constitutional rights are limitations upon government, not upon citizens. The Sixth Amendment tells the government that it cannot deprive individuals of their liberty without a fair trial, and by judicial decision that guarantee has come to mean that the government may not perform governmental acts that deprive a person of a fair trial. The alternatives to censorship, which Judge Norris describes, are judicial methods for preserving a fair trial.

The First Amendment tells the government that it may not prevent the press (or other news media) from publishing the product of their investigation and reporting. These rights do not hurl the individual into conflict with the press. These rights simply limit the reach of government power over both the individual and the press. Linde, *Fair Trials and Press Freedom—Two Rights Against the State*, 13 Willamette Law Journal 211 (1977).

REINHARDT, Circuit Judge, concurring:

I concur fully in the court's opinion authored by Judge Norris. I am also in complete agreement with the statements made by Judge Goodwin in his special concurrence.