Joe HUNT, Plaintiff–Appellant,

v.

NATIONAL BROADCASTING COMPANY, INC.; ITC Productions, Inc., Defendants–Appellees.

No. 87–6625.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1988.

Submission Withdrawn Dec. 7, 1988.

Resubmitted Dec. 28, 1988.

Decided April 3, 1989.

Jeffrey L. Melczer, Alhambra, Cal., and M. Eileen McGarry, Dummit, Faber & Brown, Los Angeles, Cal., for plaintiff-appellant.

Rex S. Heinke, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants-appellees.

Before WALLACE, POOLE and KOZINSKI, Circuit Judges.

WALLACE, Circuit Judge:

Hunt appeals from the district court's denial of his motions for a temporary restraining order and preliminary injunction. Hunt unsuccessfully sought to prevent National Broadcasting Company (NBC) from broadcasting a "docudrama" entitled "Billionaire Boys Club," which was produced by I.T.C. Productions, Inc. (ITC). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1441. We have jurisdiction over Hunt's timely appeal pursuant to 28 U.S.C. § 1292(a)(1). We affirm.

I

On October 28, 1987, Hunt filed a complaint in Los Angeles County Superior Court requesting a temporary restraining order and a preliminary injunction against NBC's scheduled broadcast of "Billionaire Boys Club" on November 8 and 9, 1987. At that time, Hunt already had been convicted in Los Angeles for the murder of Ronald Levin, and was awaiting trial in San Mateo County for his alleged role in the murder of Hedayat Eslaminia. Following NBC and ITC's removal of the case, the district court denied Hunt's motions, and "Billionaire Boys Club" was aired on November 8 and 9, 1987.

Hunt contended that the broadcast of this docudrama would infringe his sixth amendment right to a fair trial. The docu-

drama portrays Hunt planning and committing the Eslaminia murder for which he will be tried, and establishes Hunt's motive. Hunt's real name is used, although Eslaminia's is not. The docudrama depicts Hunt's involvement with an enterprise and social group called the "Billionaire Boys Club," and portrays Hunt's personality, activities, and business affairs in ways that further connect him to this murder. Hunt argued that airing this film would severely prejudice his right to a fair trial before unbiased jurors for his alleged role in the Eslaminia murder. In addition, Hunt's conviction in Los Angeles County for the Levin murder was, and still is, on appeal. Should that conviction be reversed, Hunt argued, the broadcast would have a similar effect on any retrial. The docudrama portrays Hunt's social and business dealings with Levin (whose real name is used), establishes Hunt's criminal motive, and depicts Hunt planning and committing Levin's murder. Hunt is shown bragging to friends about the deed, which he calls a "perfect crime." The docudrama features a trial in which Hunt is prosecuted for Levin's murder. After hearing witness after witness testify against Hunt, the jury finds him guilty of first degree murder.

Hunt sought to enjoin this and any future broadcast of "Billionaire Boys Club," as well as distribution of the docudrama, until his pending criminal cases are final.

## II

■ Because the district court denied Hunt's motions, NBC aired "Billionaire Boys Club" as scheduled. We first address the threshold question whether this appeal should be dismissed as moot.

Article III, section 2 of the Constitution extends the judicial power of the federal courts to actual cases or controversies. "The Court has recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.'" *Nebraska Press Association v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976) (*Nebras-*

*ka Press*), *quoting Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). We have applied this exception to the mootness doctrine where "the complaining party is likely to be subject to the same harm." *United States v. Oregon,* 718 F.2d 299, 302 (9th Cir.1983) (*Oregon*).

*Nebraska Press* involved an order restraining the media from broadcasting certain information regarding a murder case. 427 U.S. at 543–45, 96 S.Ct. at 2795. The order expired by its own terms before the case reached the United States Supreme Court. *Id.* at 546, 96 S.Ct. at 2796–97. The Court held that the case was not moot because it was capable of repetition in two respects. First, if the defendant's conviction were overturned and a new trial ordered, the trial court "may enter another restrictive order to prevent a resurgence of prejudicial publicity." *Id.* Second, the Court observed that the State of Nebraska was a party to the case, and that the Nebraska Supreme Court's opinion authorized state prosecutors to seek similar orders in future cases. *Id.* at 546–47, 96 S.Ct. at 2697. The dispute between the parties would likely evade review, or at least fully considered plenary review by the Supreme Court, because such orders tend to be short-lived. *Id.*

Here, as in *Nebraska Press,* once Hunt faces trial for the San Mateo murder case, or should his Los Angeles murder conviction be overturned and a new trial occur, a resurgence of public interest in Hunt and the "Billionaire Boys Club" may prompt NBC to air the docudrama again. NBC has acknowledged that it might do so, and would object to any restriction on its discretion to rebroadcast it. Yet in this type of case, an injunction is generally sought, as it was here, shortly before a scheduled broadcast date. The broadcast in question will thus already have occurred or been prevented before effective appellate review can take place.

In *Oregon,* the district court issued an injunction to allocate salmon fishing rights along the Columbia River during the 1982 season. 718 F.2d at 301–02. An interstate agency appealed the injunction, and we had

to determine whether the expiration of the 1982 salmon fishing season had mooted the appeal. *Id.* at 302. We observed that the difficulty of forecasting the seasonal fish run requires the district court to wait until shortly before the fishing season to issue its orders and that the conflict between the parties was certain to continue. *Id.* We therefore found that this dispute was "capable of repetition, yet evading review," between the same complaining parties. *Id.*

A similar pattern presents itself here. If NBC decides to broadcast the docudrama before all criminal proceedings against Hunt are finalized, there will be insufficient time before the broadcast for plenary, considered appellate review. Yet the same dispute between Hunt and NBC may recur, and Hunt will claim the same harm.

NBC and ITC have failed to meet the heavy burden required by the Supreme Court to demonstrate that this action is moot. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). It cannot "be said with assurance that there is no reasonable expectation that the alleged violation will recur." *Id.* Nor can we see how "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* We therefore have jurisdiction to entertain this appeal.

### III

Hunt moved for both a temporary restraining order and a preliminary injunction. Both motions were denied. We cannot tell whether he appeals from denial of both motions, or only the preliminary injunction. Since the denial of a temporary restraining order is not generally appealable unless it effectively decides the merits of the case, *Graham v. Teledyne–Continental Motors,* 805 F.2d 1386, 1388 (9th Cir.1986), *cert. denied,* — U.S. ——, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987), we review the denial of Hunt's motion for a preliminary injunction. 28 U.S.C. § 1292(a)(1).

"Review of an order granting or denying a preliminary injunction is much more limited than review of an order granting or denying a permanent injunction." *Zepeda v. United States Immigration & Naturalization Service,* 753 F.2d 719, 724 (9th Cir. 1983) (*Zepeda*). A district court has discretion to grant or deny a motion for a preliminary injunction, and we will reverse only if that discretion has been abused. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 673 (9th Cir.1988) (*Caribbean Marine*); *Zepeda,* 753 F.2d at 724; *Sports Form, Inc. v. United Press International, Inc.,* 686 F.2d 750, 752 (9th Cir. 1982) (*Sports Form*).

The district court may abuse its discretion several ways. First, the court abuses its discretion if it did not apply the correct legal standard governing the issuance of preliminary injunctions, or if it misapprehended the underlying substantive law. *Zepeda,* 753 F.2d at 724–25; *Sports Form,* 686 F.2d at 752. Second, the district court abuses its discretion if its decision rested on a clearly erroneous finding of a material fact. *Zepeda,* 753 F.2d at 725; *Sports Form,* 686 F.2d at 752–53. Review of fact-finding is restricted to the limited record available to the district court when it decided the motion. *Sports Form,* 686 F.2d at 753. Finally, the court may apply "an acceptable preliminary injunction standard in a manner that results in an abuse of discretion." *Zepeda,* 753 F.2d at 724.

In reviewing the district judge's application of a preliminary test to the substantive legal area and the facts before him, we will not reverse the district court's order simply because we would have reached a different result. To determine whether there has been an abuse of discretion, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... The [reviewing] court is not empowered to substitute its judgment for that of the [district court]."

*Id.* at 725, *quoting Sports Form,* 686 F.2d at 752.

The parties have chosen not to proceed in the district court to determine whether a permanent injunction will be granted. We stress how review of a preliminary injunction order differs from review of a perma-

nent injunction judgment because it is apparent that parties in some cases appeal orders granting or denying preliminary injunctions to obtain a preview of how the appellate court will rule on the merits. Here, as in *Zepeda,* "we are requested to express an opinion on very important legal questions concerning individual constitutional rights," but the nonintrusive nature of our review of the preliminary injunction order means that our disposition provides little guidance on the underlying merits. 753 F.2d at 724. Our opinion will affect the rights of these parties only until the district court renders judgment on the merits of the case, at which point the losing party may again seek review. *Id.; see Caribbean Marine,* 844 F.2d at 673. "One properly may wonder whether this is an efficient use of limited judicial facilities." *Zepeda,* 753 F.2d at 724.

## IV

■ A party seeking a preliminary injunction must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips in its favor. *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* At minimum, the party seeking the injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987) (citations omitted).

We turn now to the application of our rules governing review of a preliminary injunction and determine whether there was an abuse of discretion. Hunt does not contend that the district court applied an incorrect standard for determining whether a preliminary injunction should issue, nor does he argue that the district court's decision rested on a clearly erroneous finding of a material fact. Rather, his argument appears to be that the district court misapprehended and misapplied the law.

### A.

■ To determine whether an abuse of discretion occurred, we examine whether the district court "misapprehended the law with respect to the underlying issues in litigation." *Zepeda,* 753 F.2d at 725 (citations omitted). The district court held that Supreme Court and Ninth Circuit precedent prevented granting Hunt's motion for a prior restraint on the exercise of first amendment rights. The district court relied on three cases: *Nebraska Press; Columbia Broadcasting Systems, Inc. v. United States District Court,* 729 F.2d 1174 (9th Cir.1983) (*CBS*); and *Goldblum v. National Broadcasting Corp.,* 584 F.2d 904 (9th Cir.1979) (*Goldblum*).

In *Nebraska Press,* the Court, while stating that freedom of the press is not an absolute right, 427 U.S. at 557, 96 S.Ct. at 2801, stressed that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Id.* at 559, 96 S.Ct. at 2803. The Court explained that those seeking to justify a prior restraint must satisfy a heavy burden. *Id.* at 558, 559, 96 S.Ct. at 2802, 2803. Courts reviewing a prior restraint

> must examine the evidence before the trial judge when the order was entered to determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger. The precise terms of the restraining order are also important. We must then consider whether the record supports the entry of a prior restraint on publication, one of the most extraordinary remedies known to our jurisprudence.

*Id.* at 562, 96 S.Ct. at 2804. The Court stated that the record must make clear that without the restraint, pretrial publicity "would so distort the views of potential jurors that *12 could not be found* who

would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Id.* at 569, 96 S.Ct. at 2807 (emphasis added). The Court concluded that it was not clear that twelve such jurors could not be found. *Id.* Next, the Court emphasized the existence of alternatives available to the trial court, including extensive voir dire, change of venue, delay of trial, emphatic and clear instructions to the jury, and jury sequestration, as measures to limit any prejudicial impact of pretrial publicity before prior restraint may be necessary. *Id.* at 563–64, 96 S.Ct. at 2805. Finally, the Court pointed out that it was far from certain that this prior restraint would actually serve its intended purpose. *Id.* at 569, 96 S.Ct. at 2807.

In *CBS*, we reversed a district court's temporary restraining order (TRO) prohibiting the television network from "disseminating and/or broadcasting any portion of any and all government surveillance tapes generated in the investigation and prosecution" of John DeLorean. 729 F.2d at 1176. We reviewed the TRO under our mandamus jurisdiction and, although the case involved a TRO rather than a preliminary injunction, we applied the standard articulated by *Nebraska Press* to overturn the prior restraint.

We held that the record did not demonstrate publicity so likely to prejudice the entire community that twelve unbiased jurors could not be found. *Id.* at 1180. Elaborating on the *Nebraska Press* test, we explained that to assess the prejudicial effect of pretrial publicity, courts "must look not simply to [publicity's] effect on individual viewers but to its capacity to inflame and prejudice the entire community." *Id.* While acknowledging the magnitude of publicity surrounding DeLorean, we observed that even in cases as heavily publicized as Watergate and Abscam, "many, if not most, potential jurors are untainted by press coverage." *Id.* at 1179–80. We also explained that two relevant factors in evaluating the likely impact of pretrial publicity upon a community are whether the subject matter of the case is lurid or highly inflammatory, and whether

the community itself is small and rural, or large, populous, metropolitan and heterogeneous. *Id.* at 1181–82. Finally, we rejected the district judge's dismissal of voir dire as an effective alternative; we stressed the availability of voir dire, emphatic and clear instructions, and other alternatives to prior restraint. *Id.* at 1182.

*Goldblum* involved a last minute effort to enjoin NBC from broadcasting a television docudrama called the "Billion Dollar Bubble" depicting securities and insurance fraud. 584 F.2d at 905. Goldblum had already been convicted and was in prison for his role in the fraud, but he contended that the docudrama inaccurately portrayed the fraud and his role in it. The docudrama, he argued, would inflame public opinion against him, and thus jeopardize his release on parole, his right to a fair trial in a related civil action, and his right to a fair trial in any possible future criminal action. *Id.* at 905–07. The district judge ordered NBC to produce a copy that he could view for inaccuracies and, when NBC refused, held the network in contempt. *Id.* at 906.

We granted mandamus relief and reversed the contempt order. We reviewed the order as if it were itself a prior restraint, since its sole purpose was to aid the court in determining whether to enjoin the broadcast. *Id.* at 906–07. Such a prior restraint was "presumptively unconstitutional." *Id.* at 906. We found no basis in fact or law for Goldblum's theories that without prior restraint the docudrama would prejudice his consideration for parole or a wholly speculative future criminal prosecution. *Id.* at 906–07.

In the case before us, Hunt initially questioned whether NBC's docudrama should receive the same degree of first amendment protection from prior restraint as news coverage receives under *Nebraska Press*. Hunt characterized the docudrama as "not a news story, but ... a drama produced for profit based upon, but not limited to, documentary facts." NBC and ITC characterize it as a "fact based drama." The Supreme Court has held that motion pictures enjoy first amendment protection even though they are designed to

entertain, and are produced and exhibited for private profit. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952). *Burstyn* did not, however, hold that motion pictures must receive the same degree of protection as other methods of expression. *Id.* at 503, 72 S.Ct. at 781.

We assumed in *Goldblum*, without discussion, that the docudrama constituted speech protected by *Nebraska Press* from prior restraint. 584 F.2d at 906. *Goldblum* does not necessarily determine whether, under the circumstances here, NBC's docudrama is entitled to the same degree of protection under *Nebraska Press* as a news report. In *Goldblum*, we found the request for a prior restraint frivolous, and lacking any basis in fact or law; thus, we did not need to decide whether docudramas were entitled to the same protection from prior restraint that news reports enjoy. *See id.* at 906–07. Moreover, Hunt faces a pending criminal prosecution for murder, whereas Goldblum faced only parole hearings, and any future criminal prosecution was "wholly speculative." *Id.* at 906.

At oral argument, however, Hunt conceded that *Goldblum* required application of the prior restraint standard of *Nebraska Press* to the NBC docudrama here. For purposes of this appeal, therefore, we assume without deciding that the standard articulated in *Nebraska Press* applies to this docudrama.

*Nebraska Press*, *CBS*, and *Goldblum* clearly supply the relevant body of law for Hunt's action. Under the circumstances of this case, we cannot say that "the district court misapprehended the law in its preliminary assessment of the merits." *Caribbean Marine*, 844 F.2d at 673. Hunt has not met his burden on this issue.

### B.

█ Hunt next contends that the district court applied the preliminary injunction standard "in a manner that results in an abuse of discretion." *Zepeda*, 753 F.2d at 724. The *Nebraska Press* standard is an exacting one, and, as pointed out earlier, allows a prior restraint only if its absence would prevent securing twelve jurors who could, with proper judicial protection, render a verdict based only on the evidence admitted during trial. 427 U.S. at 569, 96 S.Ct. at 2807.

Hunt has not made this difficult showing. As to the Eslaminia charge, the jury pool in San Mateo County, as of October 27, 1987, exceeded 530,000, a number far exceeding the total population—80,000—in the relevant venues in *Nebraska Press*. *Id.* at 563 n. 7, 96 S.Ct. at 2805 n. 7. In the district court proceedings, NBC projected that 15% of adults in San Mateo County would watch the broadcast; ultimately, approximately 21.3% watched. Even taking into account any possible "ripple effect" of the broadcast, there remains an extremely large pool of untainted potential jurors from which to draw twelve. *See id.* at 569, 96 S.Ct. at 2807; *CBS*, 729 F.2d at 1180.

Hunt has not demonstrated that this broadcast would inflame and prejudice the entire San Mateo County community. *See CBS*, 729 F.2d at 1180. While this case may involve lurid or inflammatory subject matter, San Mateo County is the type of populous, heterogeneous metropolitan area where prejudicial publicity is less likely to endanger the defendant's right to a fair trial. *Id.* at 1181–82.

Similarly, should Hunt secure a retrial in the Levin case, it would occur in Los Angeles. There has been no showing that twelve unbiased jurors could not be found there. *See id.; see also People v. Manson*, 61 Cal.App.3d 102, 189–90, 132 Cal.Rptr. 265 (1976) (Los Angeles County, with 7 million inhabitants in 1970, was a populous, heterogeneous metropolitan area capable of supplying satisfactory jury panel for prosecution of Charles Manson for highly publicized crimes), *cert. denied*, 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382, (1977).

The Court in *Nebraska Press* stressed the existence of alternatives to prior restraint. Hunt has not met the burden of demonstrating why measures available to the trial court such as voir dire, jury instructions, delay, change of venue or jury sequestration would not suffice to protect

his rights. 427 U.S. at 563–65, 96 S.Ct. at 2804–06; *see also CBS*, 729 F.2d at 1181–82. "The alternatives to censorship ... are judicial methods for preserving a fair trial." *CBS*, 729 F.2d at 1184 (Goodwin, J., concurring).

Nor has Hunt demonstrated that the proposed prior restraint would effectively protect his rights. *Nebraska Press*, 427 U.S. at 562, 565–67, 96 S.Ct. at 2804, 2805–07. NBC's docudrama aside, substantial and unrestrained publicity concerning Hunt and the Billionaire Boys Club has already been exposed to the public.

We conclude, therefore, that the denial of the preliminary injunction "was based on a consideration of the relevant factors" and there has been demonstrated no "clear error of judgment." *Zepeda*, 753 F.2d at 725.

### V

NBC urges us to adopt the position expressed in Judge Goodwin's concurrence in *CBS*. Judge Goodwin suggested that there is no conflict between the sixth amendment right to a fair trial and the first amendment right to publish information, because both constitutional guarantees are limitations upon government, not upon citizens. *CBS*, 729 F.2d at 1184 (Goodwin, J., concurring). Whatever Hunt's rights may be under the sixth amendment, NBC argues, he cannot possibly restrain the right of a purely private actor, NBC, to broadcast without prior restraint. Hunt thus failed to state a claim against NBC, and was thus not entitled to injunctive relief.

We need not determine the precedential value of the proposition stated in Judge Goodwin's concurrence in *CBS*. All three judges on the panel concurred fully in the opinion written by Judge Norris, which decided the case as described above. 729 F.2d at 1184. It is true that Judge Goodwin's concurrence also garnered a second vote through the "complete agreement" of Judge Reinhardt. *Id.* This may constitute a majority vote on that issue. However, because we already conclude on other grounds that there was no abuse of discre-

tion in denying Hunt's motion for a preliminary injunction, we need not address NBC's argument that Judge Goodwin's *CBS* concurrence is binding and correct. To the extent that it is, however, it would constitute a separate and adequate reason why there was no abuse of discretion by the district judge.

AFFIRMED.