753 F.2d 719
 40 Fed.R.Serv.2d 1285
 Virginia ZEPEDA, Yolanda Gamboa, Guillermo Olvera, Maria
Josefa Botello, Ramon Munoz, Domingo Zepeda,
Rafael Pastor, Joe Paz, David Loura
Tapia and Paz Raul Flores,
Plaintiffs-Appellees,
v.
UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, David
Crosland, Edward O'Connor, Joe Howerton and Philip
Smith, Defendants-Appellants.
 No. 80-5464.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 7, 1982.
Decided April 12, 1983.
As Amended Jan. 30 and March 26, 1985.
 
 Appeal from the United States District Court for the Central District of California.
 Before CHAMBERS, WALLACE, and NORRIS, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 With increasing frequency, we are requested to pass upon the method used by the Immigration and Naturalization Service (the INS) in its efforts to enforce the immigration laws enacted by Congress. Here, in a case challenging some of its actions, the district court entered a preliminary injunction against the INS and its officers and agents within the Central District of California. The merits of the case present the difficult question whether these officers have violated and will violate constitutional rights of the targets of their investigations. We will not pass on the merits of the critical issues involved due to the posture of the appeal presented. As to the preliminary injunction, we affirm in part, but reverse and remand to the district court for modification of the scope of the injunction.
 
 
 2
 * A class-action complaint was filed in the district court seeking declaratory, injunctive, and monetary relief for alleged statutory and fourth amendment violations during INS enforcement operations. The seven individual plaintiffs include United States citizens of Mexican descent, permanent resident aliens of Mexican origin, and a Mexican national legally entitled to remain in the United States. The district judge denied, without prejudice, the petition to certify a class on the basis that the individual plaintiffs sought damages in addition to injunctive relief.
 
 
 3
 The individual plaintiffs subsequently moved for a preliminary injunction. In support of the motion, they provided numerous depositions and affidavits stating that INS agents, or local police officers accompanying INS agents, had entered and searched residences without consent, had forcibly entered residences, had entered and searched nonpublic areas of businesses without consent, and had detained and questioned Hispanic persons without reasonable suspicion that they were aliens. None of the individuals was presented with a warrant or other form authorizing the enforcement operations. The court was also provided with local newspaper articles on INS enforcement operations and an INS policy statement on area control operations prohibiting such operations in residential areas except in unusual circumstances. In spite of previous stipulations entered into by the INS which the INS claimed would control the alleged unlawful practices, the district court was presented with evidence that the stipulations would not effectively curtail the practices.
 
 
 4
 Based upon the record before him, which did not include any oral evidence subjected to cross-examination, the district judge made "findings of fact" that INS agents engaged in a practice of approaching homes to question, search, or arrest persons therein, without reasonable suspicion based on articulable facts to believe that aliens were present, often did so at night, and did so without a court order or the presence of probable cause or exigent circumstances. He also found that INS agents engaged in a practice of entering and conducting general searches of residences and nonpublic areas of businesses without consent, warrants, or exigent circumstances justifying the action; that agents engaged in a practice of questioning persons about their immigration status without a reasonable suspicion of alienage, solely on the basis of Hispanic appearance, use of Spanish, or location in a predominantly Hispanic area; and that agents engaged in a practice of arresting persons without a warrant and without probable cause to believe they were aliens and likely to escape before a warrant could be obtained. In addition, the district judge found that the INS sought and utilized the aid of local police in enforcing federal immigration laws, that arrest warrants were not sought or obtained during the enforcement operations, and that the INS reasonably could be expected to continue the practices unless enjoined.
 
 
 5
 The district judge entered a preliminary injunction restraining the INS from:
 
 
 6
 1) Approaching homes for the purposes of questioning, searching or arresting persons therein unless the officers have a reasonable suspicion, based on articulable facts, that aliens present in the United States in violation of the Immigration and Nationality Act are therein[.]
 
 
 7
 2) Approaching homes for the purpose of questioning, searching or arresting persons therein between the hours of 8:00 P.M. and 7:00 A.M. except, (a) in exigent circumstances and with probable cause to believe that aliens present in the United States in violation of the Immigration Act are therein; (b) upon the authority of a valid arrest warrant or other order of a court of competent jurisdiction.
 
 
 8
 3) From entering a residence or the nonpublic area of a business unless valid consent is given or the INS officer possesses a search warrant or other court order, or unless exigent circumstances exist based upon probable cause to believe that illegal aliens are present therein.
 
 
 9
 4) Engaging in general searches of homes or the nonpublic area of businesses to seek documents or persons, except (a) when a lawful arrest is made, officers may search the person arrested, and (b) may seize any evidence on the arrestee's person, and (c) may search the immediate area of arrest in order to seize any evidence within plain sight. Such searches are also authorized where exigent circumstances based upon probable cause exist and where there is cause to believe, based on articulable facts, that evidence located on the premises will be destroyed before a warrant or order can be obtained.
 
 
 10
 5) Approaching and questioning persons in homes, businesses and public places concerning their immigration status unless the officers have a reasonable suspicion, based on articulable facts and reasonable inferences drawn therefrom, that the persons questioned are aliens; persons shall not be questioned solely based on their Hispanic appearance, and/or because they are speaking Spanish and/or because they are located in an area predominantly populated by Hispanic persons.
 
 
 11
 6) Detaining and questioning persons concerning their immigration status unless the officers have a reasonable suspicion based on articulable facts and reasonable inferences drawn therefrom, that the persons detained and questioned are aliens present in the United States in violation of the Immigration Act.
 
 
 12
 7) Arresting persons, except (a) with authority of an arrest warrant issued pursuant to 8 U.S.C. Sec. 1357, or (b) with authority of a warrant or order issued by a United States District Judge or Magistrate, or (c) upon probable cause, based upon articulable facts and reasonable inferences drawn therefrom that the persons arrested are aliens present in the United States in violation of the Immigration Act and are likely to escape before an arrest warrant can be obtained.
 
 
 13
 8) Seeking or utilizing the assistance of local or State police agencies in enforcement activities conducted pursuant to 8 USC Sec. 1357, except that (a) INS agents may seek the assistance of local or State police agencies when a reasonable belief exists, based upon articulable facts, that the INS agents are, or will be in personal danger, or (b) INS agents may question persons reasonably believed to be aliens when such persons are in the custody of local or State police agencies pursuant to their lawful authority.
 
 II
 
 14
 We begin by identifying how little we can assist in the final resolution of the critical issues before the district court. Until a permanent injunction is granted or denied, we are foreclosed from fully reviewing the important questions presented. Review of an order granting or denying a preliminary injunction is much more limited than review of an order granting or denying a permanent injunction. Sports Form, Inc. v. United Press International, Inc., 686 F.2d 750, 752-53 (9th Cir.1982) (Sports Form ). At the preliminary injunction stage, the substantive law aspects of the district court's order will be reversed only if the order rests on an erroneous legal premise and, thus, constitutes an abuse of discretion; at the permanent injunction stage, we freely review all conclusions of law. Review of factual findings at the preliminary injunction stage is, of course, restricted to the limited and often nontestimonial record available to the district court when it granted or denied the injunction motion. The district court's findings supporting its order granting or denying a permanent injunction may differ from its findings at the preliminary injunction stage because by then presentation of all the evidence has been completed. Then too, our determination whether its subsequent findings are clearly erroneous may differ from our view taken at the preliminary stage. Id.
 
 
 15
 We emphasize the ways in which review of an order granting or denying a preliminary injunction differs from review of an order granting or denying a permanent injunction because we are persuaded that in some cases, parties appeal orders granting or denying motions for preliminary injunctions in order to ascertain the views of the appellate court on the merits of the litigation. For example, here we are requested to express an opinion on very important legal questions concerning individual constitutional rights that have collided with government efforts to enforce the law. Because our review of the law applied by the district court is so limited and because the fully developed factual record may be materially different from that initially before the district court, our disposition of appeals from most preliminary injunctions provides little guidance on the appropriate resolution of the merits. Furthermore, in many cases, appeal of a district court's preliminary injunction order will result in unnecessary delay to the parties and inefficient use of judicial resources. We think it likely that this case, for instance, could have proceeded to a disposition on the merits in far less time than it took to process this preliminary appeal. The parties, apparently, have made no effort in the district court to finalize this litigation even though the district court, on one occasion, considered dismissing the action for failure to prosecute. In addition, our disposition of this appeal will affect the rights of the parties only until the district court renders judgment on the merits of the case, at which time the losing party may appeal again. Sports Form, 686 F.2d at 753. One properly may wonder whether this is an efficient use of limited judicial facilities.
 
 III
 
 16
 The grant or denial of a motion for a preliminary injunction lies within the discretion of the district court. Its order granting or denying the injunction will be reversed only if the district court abused its discretion. See id. at 752; Wright v. Rushen, 642 F.2d 1129, 1132 (9th Cir.1981); Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1200 (9th Cir.1980) (L.A. Coliseum ). A district judge may abuse his discretion in any of three ways: (1) he may apply incorrect substantive law or an incorrect preliminary injunction standard; (2) he may rest his decision to grant or deny a preliminary injunction on a clearly erroneous finding of fact that is material to the decision to grant or deny the injunction; or (3) he may apply an acceptable preliminary injunction standard in a manner that results in an abuse of discretion.
 
 
 17
 A district court's order is reversible for legal error if the court did not employ the appropriate legal standards which govern the issuance of a preliminary injunction, id.; see Benda v. Grand Lodge of the International Association of Machinists & Aerospace Workers, 584 F.2d 308, 314-15 (9th Cir.1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); Aguirre v. Chula Vista Sanitary Service & Sani-Tainer, Inc., 542 F.2d 779, 781 (9th Cir.1976), or if, in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in litigation. Wright v. Rushen, 642 F.2d at 1132; L.A. Coliseum, 634 F.2d at 1200; Kennecott Copper Corp. v. Costle, 572 F.2d 1349, 1357 n. 3 (9th Cir.1978).
 
 
 18
 Abuse of discretion may occur when the district court rests its decision to grant or deny a preliminary injunction on a clearly erroneous finding of fact. See Buchanan v. United States Postal Service, 508 F.2d 259, 267 n. 24 (5th Cir.1975); Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 203 (2d Cir.1966). A finding of fact is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Edinburgh Assurance Co. v. R.L. Burns Corp., 669 F.2d 1259, 1261 (9th Cir.1982).
 
 
 19
 In reviewing the district judge's application of a preliminary injunction test to the substantive legal area and the facts before him, we will not reverse the district court's order simply because we would have reached a different result. To determine whether there has been an abuse of discretion, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. ... The [reviewing] court is not empowered to substitute its judgment for that of the [district court]." Sports Form, 686 F.2d at 752, quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (citations omitted).
 
 IV
 
 20
 Federal district courts have equitable power to enjoin law enforcement agencies when such agencies have engaged in a persistent pattern of misconduct. Allee v. Medrano, 416 U.S. 802, 815-16, 94 S.Ct. 2191, 2200, 40 L.Ed.2d 566 (1974) (injunction against police intimidation of union organizing efforts was proper exercise of district court's equitable power when there was a persistent pattern of police misconduct, not merely isolated instances of misconduct under valid statutes); cf. City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (injunctive relief to bar use of chokeholds by police denied because plaintiff failed to show likelihood of future injury from challenged practice); Rizzo v. Goode, 423 U.S. 362, 373-76, 96 S.Ct. 598, 605-06, 46 L.Ed.2d 561 (1976) (police force's failure to act in face of "unacceptably high" statistical pattern was not enjoinable; distinguishing "active conduct" enjoined in Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974)). See also Loya v. INS, 583 F.2d 1110, 1114 (9th Cir.1978) (reversing grant of partial summary judgment denying injunctive relief) ("injunctive relief may be available as to future INS conduct"). We find no merit in the INS's contention that the individual plaintiffs failed to show that the alleged unconstitutional practices were the responsibility of the INS. Cf. Rizzo v. Goode, 423 U.S. at 375-77, 96 S.Ct. at 606-07 (no duty on defendant police department to eliminate future misconduct by a small part of police force).
 
 
 21
 Plaintiffs argue on appeal that section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1357(a)(1), restricts the power of INS agents to question persons about their immigration status without a reasonable suspicion of alienage. The statute authorizes the INS "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" without a warrant. The INS argues that Congress, in adopting the statute, conferred upon the INS the authority to question aliens to the fullest extent permissible under the fourth amendment. We agree with the INS.
 
 
 22
 The plain meaning of the words of the statute leads us to conclude that it does not refer merely to approaching and questioning about immigration status. The use of the word "interrogation" connotes a detentive situation.
 
 
 23
 The legislative history supports this statutory construction. Prior to the enactment of the Immigration and Nationality Act of 1952, there was no provision giving INS officers special powers to "interrogate." The 1925 predecessor of the 1952 provisions was, except for the absence of paragraph (1) regarding interrogation, nearly identical to the present section 1357, and gave the INS the same powers of search, seizure, and arrest which currently appear in 8 U.S.C. Sec. 1357(a)(2), (3). 43 Stat. 1049 (1925).
 
 
 24
 Between 1925 and 1952, INS officers had regularly questioned people about their citizenship. Both proponents and opponents of the 1952 bill believed that section 1357(a)(1) was an augmentation, not a limitation of then-existing INS powers. See 98 Cong.Rec. 5160-61, 5179 (1952); see also 5787-88, 5797-98.
 
 
 25
 No case has been cited to us in which we have specifically addressed this issue. We find support for our interpretation of the statute, however, in Babula v. INS, 665 F.2d 293 (3d Cir.1981). In that case, aliens contended that the INS violated both the fourth amendment and 8 U.S.C. Sec. 1357(a)(1) and (2) by arresting them. The Third Circuit held that an INS officer has as much authority as permissible under the fourth amendment.
 
 
 26
 Eight U.S.C. Sec. 1357(a)(1) provides that any INS agent may, without a warrant, "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." An INS agent's authority under Sec. 1357(a)(1) to interrogate a person believed to be an alien is limited by the restriction of the fourth amendment. Lee v. INS, 590 F.2d 497, 499-500 (3rd Cir.1979). In Lee, this court formulated the test that would be applied to challenges of power under section 1357(a)(1) as whether the questioned conduct was " ' "reasonably related in scope to the justification for [its] initiation." ' " Id. at 502 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (quoting Terry v. Ohio, 392 U.S. at 29, 88 S.Ct. [1868] at 1884 [20 L.Ed.2d 889 (1968) ]).
 
 
 27
 Since the same standards govern the validity of the seizure under section 1357(a)(1) as under the fourth amendment, questioning that is permissible under the fourth amendment is also permissible under section 1357(a)(1).
 
 
 28
 665 F.2d at 295; see also Cheung Tin Wong v. INS, 468 F.2d 1123 (D.C.Cir.1972) (reasonable suspicion of alienage warranted a brief stop of alien). Cases cited by the plaintiffs from other circuits do not appear to have decided this precise issue. See Illinois Migrant Council v. Pilliod, 540 F.2d 1062, 1070 n. 10 (7th Cir.1976), modified, 548 F.2d 715 (7th Cir.1977) (en banc); Ojeda-Vinales v. INS, 523 F.2d 286 (2d Cir.1975); Shu Fuk Cheung v. INS, 476 F.2d 1180 (8th Cir.1973); Au Yi Lau v. INS, 445 F.2d 217, 222-23 (D.C.Cir.), cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971); Yam Sang Kwai v. INS, 411 F.2d 683, 688 (D.C.Cir.), cert. denied, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969).
 
 
 29
 Therefore, we must now turn to the constitutional arguments.
 
 
 30
 The district judge found that the INS had engaged in numerous practices violative of the fourth amendment rights of certain unidentified individuals, apparently of Latin-American extraction, and that the INS reasonably could be expected to continue the practices unless enjoined. Admittedly, the district court's findings were made on the basis of evidence that was not developed through a trial, and the district court merely adopted the individual plaintiffs' proposed findings of facts. Nevertheless, we hold that the lower court's factual findings of INS practices violative of the fourth amendment and its finding that the INS reasonably could be expected to continue the practices were not clearly erroneous.
 
 
 31
 Our affirmance of the injunction, insofar as it is consistent with the dictates of the fourth amendment, also rests upon our conclusion that the district judge properly applied the criteria for granting a preliminary injunction. Traditionally, those criteria have been stated as (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to the plaintiff if relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. L.A. Coliseum, 634 F.2d at 1200; see Sierra Club v. Hathaway, 579 F.2d 1162, 1167 (9th Cir.1978); County of Alameda v. Weinberger, 520 F.2d 344, 349 (9th Cir.1975). We have held that the party requesting relief is entitled to a preliminary injunction if it demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Sports Form, 686 F.2d at 753; L.A. Coliseum, 634 F.2d at 1201.
 
 
 32
 The individual plaintiffs were entitled to injunctive relief under either prong of our test. They demonstrated probable success on the merits by providing evidence of a pattern of INS violations of the fourth amendment. They also demonstrated a possibility of irreparable injury by showing violations of their constitutional rights which, if proven at trial, could not be compensated adequately by money damages and by showing that the INS was reasonably likely to continue those practices. Cf. L.A. Coliseum, 634 F.2d at 1202 (no showing of irreparable harm when losses could be compensated by money damages). The individual plaintiffs also met the alternative formulation of the test by first raising serious questions concerning INS practices violative of their fourth amendment rights. We cannot say that the district judge abused his discretion in concluding that the balance of hardships tipped toward the individual plaintiffs. Their fourth amendment rights could be expected to be violated. One deponent for the INS, in contrast, admitted that the INS was not having difficulty in enforcing the immigration laws under the temporary restraining order that preceded the preliminary injunction. Moreover, the INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations. The district court, therefore, did not err in enjoining those INS practices violative of the plaintiffs' constitutional rights.
 
 V
 
 33
 We must vacate and remand, however, because the scope of the injunction is too broad. On remand, the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs. National Center for Immigrants Rights, Inc. v. INS, 743 F.2d 1365, 1371 (9th Cir.1984). A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court. Under Federal Rule of Civil Procedure 65(d), an injunction binds only "the parties to the action, their officers, agents, servants, employees, and attorneys, and ... those persons in active concert or participation with them who receive actual notice of the order...." The district court must, therefore, tailor the injunction to affect only those persons over which it has power. See Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 481, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978) (holding that an order denying class certification is not appealable under 28 U.S.C. Sec. 1292(a)(1) and stating that the order "merely limits the scope of the relief that may ultimately be granted"); Baxter v. Palmigiano, 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554 n. 1, 47 L.Ed.2d 810 (1976) (dicta) ("The District Court treated the suit as a class action, ... but did not certify the action as a class action within the contemplation of Fed.Rules Civ.Proc. 23(c)(1) and 23(c)(3). Without such certification and identification of the class, the action is not properly a class action."); Hollon v. Mathis Independent School District, 491 F.2d 92, 93 (5th Cir.1974) (per curiam) (individual plaintiff's claim moot; portion of injunction restraining enforcement of school regulation as to similarly situated students was an abuse of discretion and not necessary to preserve the status quo in the absence of a class certification); Davis v. Romney, 490 F.2d 1360, 1366 (3d Cir.1974) ("Relief cannot be granted to a class before an order has been entered determining that class treatment is proper.").[1]
 
 
 34
 We also remand for modification of the injunction because the district judge relied on an erroneous legal premise concerning the reach of the fourth amendment. Portions of the injunction require the INS to do more than abide by constitutional requirements. See Allee v. Medrano, 416 U.S. at 814, 94 S.Ct. at 2199.
 
 
 35
 The district court concluded incorrectly that the mere approach of persons for the purpose of questioning them constitutes a seizure within the protection of the fourth amendment.[2] Supreme Court precedent and decisions of this court contravene that conclusion.
 
 
 36
 The Supreme Court has recently held in an INS confrontation case that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation" because it is merely a "consensual encounter" rather than a fourth amendment detention or seizure. INS v. Delgado, --- U.S. ----, 104 S.Ct. 1758, 1762-63, 1765, 80 L.Ed.2d 247 (1984). The fact that people respond to such questioning "without being told they are free not to respond ... hardly eliminates the consensual nature of the response." Id., 104 S.Ct. at 1763. Echoing previous cases, the Court held that the questioning in consensual encounters becomes a fourth amendment detention only when "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." Id. See, e.g., Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ("[n]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). See also United States v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.).
 
 
 37
 We have accordingly held previously that questioning about immigration status, in the absence of a seizure, does not require reasonable suspicion of alienage. Cuevas-Ortega v. INS, 588 F.2d 1274 (9th Cir.1979); Cordon de Ruano v. INS, 554 F.2d 944 (9th Cir.1977); see United States v. Beale, 674 F.2d 1327, 1329-30 (9th Cir.1982); United States v. Anderson, 663 F.2d 934, 939 (9th Cir.1981).
 
 
 38
 Our conclusion does not conflict with our decision in Benitez-Mendez v. INS, 707 F.2d 1107 (9th Cir.1983). There, when INS agents approached an alien in a field his co-workers ran off but he stayed, claiming to have legal papers. The officers then physically detained him without giving him the opportunity to produce those papers himself. Id. at 1108-09. Not directly addressing section 1357, we held that to be an unreasonable detention violative of the fourth amendment. We said, however, "it does not appear that the Border Patrol officer's initial encounter with petitioner amounted to a seizure...." Id. at 1108. See INS v. Delgado, --- U.S. ----, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Our concern in this case is with the reasonableness of that initial encounter, before any physical restraint is imposed.
 
 
 39
 The restriction on approaching homes for the purpose of questioning persons therein, except upon reasonable suspicion that illegal aliens are present, restricts the ability of INS officials to question neighbors, landlords, and other individuals in the course of routine investigations. This restriction, as well as the general restriction on approaching and questioning persons without reasonable suspicion of alienage, precludes practices that facilitate the enforcement of immigration laws and that do not raise constitutional issues.
 
 
 40
 In addition, the portion of the injunction prohibiting INS agents from approaching homes between the hours of 8:00 p.m. and 7:00 a.m. except in exigent circumstances and with probable cause to believe illegal aliens are present rests on the incorrect conclusion that the fourth amendment applies differently at different times of the day. There is nothing unconstitutional about questioning persons after 8:00 p.m. or before 7:00 a.m. See generally Rizzo v. Goode, 423 U.S. at 378, 96 S.Ct. at 607 ("in federal equity cases 'the nature of the violation determines the scope of the remedy....' "), quoting Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). The time at which a search or seizure is undertaken may, of course, affect the determination whether it was reasonable. The time of day, however, is not relevant to the threshold determination whether there was a search or seizure. Cf. United States v. Ortiz, 422 U.S. 891, 895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975) ("The Fourth Amendment's requirement that searches and seizures be reasonable also may limit police use of unnecessarily frightening or offensive methods of surveillance and investigation.").
 
 
 41
 Finally, the portion of the injunction prohibiting the INS from obtaining assistance from local or state police except when there is a reasonable belief that INS agents will be in danger or the person to be questioned is lawfully in custody of the local or state police, rests on an erroneous reading of Supreme Court precedent and California statutory provisions. The district court relies on Kurtz v. Moffitt, 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458 (1885) (Kurtz ), and certain provisions of the California Penal Code (Secs. 15, 830.1, 834-49). Kurtz held that neither a state police officer nor a private citizen may arrest and detain, without warrant or military order, a deserter from the United States Army. The Court found that local police agencies are without authority to arrest deserters "without the order or direction of a military officer." Kurtz, 115 U.S. at 505, 6 S.Ct. at 155. The situation in the case at hand clearly is distinguishable from the situation in Kurtz. If INS officers are employing the assistance of local police agencies, the police are acting under the direction of INS officers. Furthermore, nothing in the California Penal Code sections cited prohibits police officers from aiding INS officers. See generally Hauenstein v. Lynham, 100 U.S. 483, 490, 25 L.Ed. 628 (1879) ("It must always be borne in mind that the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."); People ex rel. Happell v. Sischo, 23 Cal.2d 478, 491, 144 P.2d 785 (1943) (same).
 
 
 42
 The district court abused its discretion when it prohibited the INS from obtaining the assistance of other law enforcement agencies. On its face, the preliminary injunction prohibits INS officers from requesting police assistance even for noncontroversial purposes. INS investigations may result in crowd control difficulties, traffic tie-ups, or other similar problems. These activities might not endanger individual INS officers, but they might present dangers or inconveniences for members of the public. Cooperation among law enforcement agencies should help solve such problems. To preclude an INS request for police assistance is inappropriate.
 
 
 43
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 
 44
 NORRIS, Circuit Judge, concurring in part and dissenting in part.
 
 
 45
 I dissent from Part V of the court's opinion in two respects: (1) I dissent as to that part of Part V reversing the portion of the injunction prohibiting INS agents from approaching plaintiffs' homes during the nighttime hours to question, search or arrest them absent exigent circumstances and probable cause or a valid arrest warrant, and (2) I dissent from the proposition that the injunction is too broad because its benefits are not limited to the individual plaintiffs. Otherwise, I concur in the court's opinion and in the judgment.
 
 I.
 
 46
 I agree with the majority that the test in determining whether a seizure has occurred is whether the conduct of the police "constitutes a show of authority that would lead a reasonable person to conclude that he is not free to go." Gomez v. Turner, 672 F.2d 134, 141 (D.C.Cir.1982). Given that standard, I can neither agree with nor understand the majority's sweeping conclusion that "[t]he time of day ... is not relevant to the threshold determination whether there was a search or seizure." Supra 753 F.2d at 731.
 
 
 47
 The time of day can have a great deal to do with whether there has been a show of authority sufficient to lead someone to reasonably believe he cannot leave. A nighttime confrontation is likely to be far more threatening than one made during the day. This is particularly true when such a confrontation occurs after a history of intimidating and violent behavior by the authorities toward the persons being questioned. There is considerable evidence of such a history in this case. There was deposition testimony that Mr. and Mrs. Zepeda were rousted from their bed at night and their home entered and searched without consent; that the Botellas observed windows being broken and officers rushing into apartments; that Mr. Gutierrez' door was burst open, his apartment searched, and the validity of his marriage challenged; that Mrs. Vargas' home was entered without her consent while she was alone with her four children; that when she tried to telephone her husband her phone was disconnected by an INS agent; and that Mr. Flores was asleep at 4:00 a.m. when six local police and INS agents demanded he open his door. His home was searched without his consent and he was put in fear of harm to his family.
 
 
 48
 This pattern of planned intimidation and abuse of power is to my mind more than sufficient to cause the plaintiffs to reasonably believe the next time agents of the INS and local police come knocking on their door at night that they are "not free to go." Id. I thus do not believe it error to hold on these particular facts that nighttime contact by the INS with the plaintiffs would inherently constitute a seizure for which exigent circumstances and probable cause or a valid arrest warrant is required. I would therefore uphold paragraph two of the injunction.
 
 II.
 
 49
 I also disagree with the majority that the preliminary injunction is overly broad because it is not limited to benefit only the individual plaintiffs. Rule 65(d) provides that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys...." Fed.R.Civ.P. 65(d) (emphasis added). The injunction at issue clearly complies with Rule 65(d) in that it is "binding" only upon the INS, a party to the action, and its agents. The majority turns Rule 65(d) on its head when it reasons that because an injunction "is binding only upon the parties to the action," it must be narrowly tailored so that it does not incidentally benefit any person not a party to the action. Rule 65(d) simply does not address the question whether an injunction may benefit non-parties; it only provides that an injunction may not bind non-parties. Contrary to the result reached by the majority in making a quantum leap from Rule 65(d), it is well settled that injunctions are not overly broad simply because they may benefit similarly situated persons who are not parties to the action. Injunctive relief typically benefits "not only the claimant but all other persons subject to the practice or the rule under attack." 7 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1771, at 663-64 (1972).
 
 
 50
 The majority's reliance on Rule 65(d) is not only misplaced, but has the effect of obfuscating the issue. The question before us for decision is not whether the injunction is overly broad because it may benefit persons other than the plaintiffs; the question is whether the injunction is broader in scope than reasonably necessary to protect the rights of the individual plaintiffs. Common sense should tell us that the district court was correct in concluding that the only way to protect the individual plaintiffs from violations of their constitutional rights was to enjoin the INS from stopping and questioning any person concerning his or her immigration status solely because he or she is of Hispanic appearance, speaks Spanish, or is in an area predominantly populated by Hispanic persons. Preliminary Injunction, p 5. An injunction restraining the INS from so stopping and questioning only these individual plaintiffs would be meaningless because prior to approaching and questioning persons of Hispanic appearance, INS agents would have no way of knowing whether the persons are these plaintiffs or others of Hispanic appearance. Thus, the only effective way to protect the constitutional rights of the individual plaintiffs as they try to live their lives free of unlawful government intrusion is to enjoin the INS from interfering with any and all persons solely because of their Hispanic appearance, speech, or neighborhood.
 
 
 51
 Not only common sense, but the case law offers overwhelming support for the injunction as issued by the district court. Bailey v. Patterson, 323 F.2d 201 (5th Cir.1963), cert. denied, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964), a leading case in this area, is instructive. In Bailey, black plaintiffs sought desegregation of transportation facilities. The Fifth Circuit declined to certify a class because the relief necessary to remedy the segregated transportation for individual plaintiffs would be identical to that necessary for a class. The plaintiffs did not merely seek access to the portions of transportation facilities set aside for whites, they sought the right to use desegregated facilities. As the court stated, "[t]he very nature of the rights [plaintiffs] seek to vindicate requires that the decree run to the benefit not only of [plaintiffs] but also for all persons similarly situated." Id. at 206. See also James v. Ball, 613 F.2d 180, 186 (9th Cir.1979), rev'd on other grounds, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981); Sandford v. R.L. Coleman Realty Co., 573 F.2d 173, 178 (4th Cir.1978); United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799, 812 (5th Cir.1974); see generally 7 C. Wright & A. Miller, Federal Practice and Procedure, Sec. 1771, at 663-64 (1972).
 
 
 52
 In reaching its conclusion that the district court's injunction is overly broad, today's majority relies upon the fact that the injunction was issued before a class was certified.[1] The majority thereby introduces a red herring into the analysis. Whether or not a class was certified is irrelevant to the question whether the scope of the injunction as issued by the district court was necessary to protect the constitutional rights of these individual plaintiffs. It is well established under Bailey and its progeny that where injunctive relief that is effectively class-wide is necessary to protect the individual plaintiffs, class certification is not required. United Farmworkers, 493 F.2d at 812 ("We find it unnecessary to determine the answer to this question [whether the district court abused its discretion in denying class action treatment], however, for whether or not appellants are entitled to class action treatment, the decree to which they are entitled is the same.... [T]he very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of the named plaintiffs but also for all persons similarly situated.") (citing Bailey, 323 F.2d at 206); see also James, 613 F.2d at 186 (denial of class certification not an abuse of discretion because the relief sought by individual plaintiffs "will, as a practical matter, produce the same result as formal class-wide relief."); Sandford, 573 F.2d at 178 (reversing district court's failure to grant injunctive relief against defendant's practice of discriminating against blacks, but affirming district court's denial of class certification "because the settled rule is that '[w]hether plaintiff proceeds as an individual or on a class suit basis, the requested [injunctive] relief generally will benefit not only the claimant but all other persons subject to the practice or the rule under attack.' " (citations omitted)).[2]
 
 
 
 [1]
 Part II of the dissent argues that our holding in Part V limiting the scope of injunctive relief to named plaintiffs is inconsistent with cases stating that certification of a class may be denied because the injunctive relief would benefit all members of the potential class. What might appear to be inconsistent, however, is clarified by a close examination of the pertinent cases
 Without a properly certified class, a court cannot grant relief on a class-wide basis. Davis v. Romney, 490 F.2d 1360, 1366 (3d Cir.1974); Yaffe v. Powers, 454 F.2d 1362, 1364-65 (1st Cir.1972); Tape Head Co. v. RCA Corp., 452 F.2d 816, 819 (10th Cir.1971) (per curiam); see also Baxter v. Palmigiano, 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554 n. 1, 47 L.Ed.2d 810 (1976) (without certification, an action is not properly a class action); Board of School Commissioners v. Jacobs, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam) (class action becomes moot if compliance with rule 23(c) has been inadequate and action has become moot with respect to individual plaintiffs-representatives); cf. Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 480-81, 98 S.Ct. 2451, 2453-54, 57 L.Ed.2d 364 (1978) (no appeal under Sec. 1291(a)(1) permitted for denial of class certification because only effect is to narrow scope of relief available). A recent decision in this circuit follows this line of precedent. In National Center for Immigrants Rights, Inc. v. INS, 743 F.2d 1365 (9th Cir.1984), we observed that "[t]he INS asserts that in the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs. We agree." Id. at 1371.
 This limitation is consistent with the traditional rule that injunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs, "rather than to 'enjoin all possible breaches of the law.' " Davis v. Romney, 490 F.2d at 1370, quoting Hartford-Empire Co. v. United States, 323 U.S. 386, 410, 65 S.Ct. 373, 385, 89 L.Ed. 322 (1945). An injunction "should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979).
 This is particularly true when, as here, a preliminary injunction is involved. A preliminary injunction can only be employed for the "limited purpose" of maintaining the status quo. University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); King v. Saddleback Junior College District, 425 F.2d 426, 427 (9th Cir.1970), cert. denied, 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971). A district court's power to issue a preliminary injunction should not be broader in scope with respect to nonparties than its powers following a full trial on the merits. If the relief granted later appears inadequate, the court can certify a class at a later time. See, e.g., Gardner v. Westinghouse Broadcasting Co., 559 F.2d 209, 212 (3d Cir.1977), aff'd, 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978).
 This clear area of the law limiting the scope of preliminary injunctions is rejected by the dissent which relies instead on certain cases involving denials of class certification. These cases appear to have sprung from a misreading of Bailey v. Patterson, 323 F.2d 201 (5th Cir.1963), cert. denied, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964). In Bailey, black plaintiffs sought desegregation of transportation facilities. The court found it unnecessary to certify a class because the relief necessary to remedy the segregated transportation for individual plaintiffs would be identical to that necessary for a class. As the court put it,
 Appellants do not seek the right to use those parts of segregated facilities that have been set aside for use by "whites only." They seek the right to use facilities which have been desegregated, that is, which are open to all.... The very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of appellants but also for all persons similarly situated.
 Id. at 206. The court's language, however, has been cited by other courts without grasping the essential factor behind it--that identical relief was inevitable to remedy the individual plaintiffs' rights. Thus, some courts erroneously cite Bailey for the proposition that class certification may be denied in discrimination cases because an individual plaintiff is entitled to identical broad-based injunctive relief. See, e.g., Sanford v. R.L. Coleman Realty Co., 573 F.2d 173, 178 & nn. 8-9 (4th Cir.1978) ("[C]lass certification was unnecessary in order to give the plaintiffs the injunctive relief they requested through class certification, assuming the facts of the case were sufficiently flagrant to support that relief."). No mention is made of the Supreme Court cases to the contrary. Of course, the Fifth Circuit in Bailey cannot overturn Supreme Court cases. In fact, it does not, if it is properly interpreted. But error has been compounded by error as the holding of Bailey continues to be misconstrued outside the narrow confines of the case.
 Thus, even if we adopted the holding of Bailey, it would not change the outcome of this case. The only way to ensure that plaintiffs could ride on desegregated buses was to desegregate the entire transportation system; the black plaintiffs did not merely want to ride in the white section of the bus. As a practical result, all other similarly situated persons benefited because the relief required for the individual plaintiffs was necessarily identical to the relief that would have been granted had a class action been filed. The situation here, however, is not analogous to Bailey. The individual plaintiffs challenge INS enforcement policies with respect to aliens of Hispanic background. A class action was denied. The injunctive relief requested can be granted to the individual plaintiffs without the relief inevitably affecting the entire class.
 Another line of cases cited by the dissent concerning denials of class certification speaks of the lack of need for a class because any injunctive relief granted will nonetheless benefit potential class members. What some of these cases indicate, however, is that as a practical matter, injunctive relief for an individual plaintiff will lead to complete relief for the potential class because defendant will voluntarily treat all alike thereafter. E.g., Galvan v. Levine, 490 F.2d 1255, 1261 (2d Cir.1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). The practical effect, of course, does not militate against the legal limitations that should be placed on the injunction. A second line of cases comes to the same conclusion because of the stare decisis effect of the initial holding, e.g., Horton v. Goose Creek Independent School District, 690 F.2d 470, 487 n. 32 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983). It is this second line of cases that initially found support in this circuit; these cases, however, have been reversed by the Supreme Court. See International Ladies' Garment Workers' Union v. Sureck, 681 F.2d 624 (9th Cir.1982), rev'd sub nom. INS v. Delgado, --- U.S. ----, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); James v. Ball, 613 F.2d 180 (9th Cir.1979), rev'd, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981).
 In a footnote, the dissent also cites Gregory v. Litton Systems, Inc., 472 F.2d 631 (9th Cir.1972), as holding that injunctive relief may be fashioned to benefit nonparties without class certification in Title VII cases. 753 F.2d at 730 n. 2. In Gregory, however, we actually vacated an injunction benefiting nonparties. Id. at 633-34. We only suggested that in certain Title VII actions, relief benefiting nonparties might be proper under the statute's unusually broad remedial scheme, while further observing that injunctive relief often "may incidentally benefit" others not before the court. Id. In Gay v. Waiters' and Dairy Lunchmen's Union, 549 F.2d 1330, 1331 n. 1 (9th Cir.1977), we specifically indicated that the question "whether an individual in a Title VII action might obtain relief which benefits nonparties" remained open after Gregory and continued to remain open. We held, however, that in the case before us "denial of class certification foreclose[d] the broad injunctive relief sought on behalf of the class." Id. at 1331.
 In the same footnote, the dissent also relies on Professional Association of College Educators v. El Paso County Community College District, 730 F.2d 258, 274 (5th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984), but that case in inapposite. See also Meyer v. Brown & Root Construction Co., 661 F.2d 369, 374 (5th Cir.1981). Professional Association merely stated that an injunction benefiting nonparties is permissible "if such breadth is necessary to give prevailing parties the relief to which they [individually] are entitled," 730 F.2d at 273-74, which is consistent with our analysis of Bailey. The court in Professional Association in fact vacated a portion of an injunction which protected nonparties. Id. at 274. The court in Meyer similarly stated that Title VII might provide for broad remedial relief, 661 F.2d at 373-74 (citing Gregory ), but then it too vacated the broad injunction at issue. Id. at 374.
 The dissent argues that an injunction against the INS with respect to only the individual plaintiffs before the court will be of little value: because the INS will not be restrained from generally harassing people on the basis of Hispanic appearance, there will be no means of distinguishing between these plaintiffs and other persons. This argument, however, is fundamentally flawed because it fails to recognize on whom the burden falls in regard to obeying the injunction. The individual plaintiffs need not take any action to identify themselves to make it easy for the INS to comply with the injunction. Rather, the burden is on the INS to comply; as a practical (but not legal) matter, the INS may have to end its challenged practices entirely to avoid the possibility of violating the injunction and being sanctioned for contempt.
 Thus, the class-wide relief is not inevitable in this case, as in Bailey, but the practical effect of the narrow injunction may be to benefit other similarly situated individuals. The fact that such broad benefits may result, however, does not permit plaintiffs to bootstrap their claim into one for class-wide relief as a matter of law. Until class certification is granted, these plaintiffs are entitled to no more than protection of themselves alone from the challenged INS practices.
 We vacate the preliminary injunction solely because it bars such practices not only against the individual plaintiffs before the court, but also against other individuals who are not before the court. Such broad relief is not necessary to remedy the rights of the individual plaintiffs; if the scope of the injunction is narrowed, there is no question that the individual plaintiffs will be protected from the INS's former practices. That is all the relief to which they are entitled. They are not entitled to relief for people whom they do not represent.
 If this elementary principle were not true, there would be no need for class actions. Whenever any individual plaintiff suffered injury as the result of official action, he could merely file an individual suit as a pseudo-private attorney general and enjoin the government in all cases. But such broad authority has never been granted to individual plaintiffs absent certification of a class. We understand concerns that rule 23 may present a significant hurdle for those seeking broad, class-based relief. But we assume that that was precisely the intent of its drafters. We should not grant representative status to a plaintiff without close scrutiny of both the appropriateness of a class action with respect to the issues in dispute and the plaintiff's ability to represent adequately the class.
 Perhaps the dissent's position is intuitively attractive at first glance because we believe that it would be fundamentally unfair for the government to be able to treat one group of individuals differently from another group that is similarly situated except for the fact that they have successfully challenged the government's actions. But our legal system does not automatically grant individual plaintiffs standing to act on behalf of all citizens similarly situated. A person who desires to be a "self-chosen representative" and "volunteer champion," Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949), must qualify under rule 23. To be sure, failure to grant class relief may leave a government official--temporarily--in a position to continue treating nonparties in a manner that would be prohibited with respect to named plaintiffs. But that is the nature of the relief. See Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975) (preliminary injunction with respect to enforcement of contested criminal statute only enjoins enforcement "with respect to the particular federal plaintiffs," leaving the state "free to prosecute others who may violate the statute.").
 Rather than retain the status quo solely of the parties before us, the dissent would instead have us reach out to change the state of the world for parties not before us. We limit named plaintiffs solely to the relief to which they are entitled. Should further relief be warranted, a class may then be certified. The problem here is a failure to recognize precisely how narrow the holding of Bailey was. Only such a narrow interpretation is consistent with Supreme Court cases.
 
 
 [2]
 The district court's conclusions of law, in part, are as follows:
 Defendants' random approach of residences for the purpose of questioning, searching or arresting persons therein constitutes an arbitrary intrusion into the privacy of the home and subjects the persons therein to a "search and seizure" within the meaning of the Fourth Amendment. Such searches and seizures are unreasonable unless founded upon a reasonable suspicion, based upon articulable facts, that aliens present in the United States in violation of the Immigration and Nationality Act are withing [sic] the home.
 ....
 ... Approaching and questioning persons in homes, businesses and public places concerning their immigration status where the officer does not have a reasonable suspicion based upon articulable facts and reasonable inferences drawn therefrom that the person questioned is an alien is a violation of 8 U.S.C. Sec. 1357 and the Fourth Amendment.
 
 
 [1]
 The cases cited by the majority, like Rule 65(d), provide absolutely no support for the majority's conclusion. They simply do not address the question presented here, namely, is the scope of the injunction necessary to protect the rights of the individual plaintiffs
 
 
 [2]
 Similarly, in Gregory v. Litton Systems, Inc., 472 F.2d 631, 633-34 (9th Cir.1972), we recognized that injunctive relief in a Title VII action "may incidentally benefit many persons not before the court." See also Professional Association of College Educators, TSTA/NEA v. El Paso County Community College District, 730 F.2d 258, 273-74 (5th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984) ("An injunction [in a Title VII action], however, is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit--even if it is not a class action--if such breadth is necessary to give prevailing parties the relief to which they are entitled." (citations omitted))